## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| EDDIE WYATT MCLAIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )      CASE NO.  2:14-CV-2043-SLB |
| | ) |
| CAROLYN  W.  COLVIN,  Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION

Plaintiff Eddie Wyatt McLain brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security's final decision denying his application for a period of disability and disability insurance benefits [DIB].  Upon review of the record and the relevant law, the court is of the opinion that the Commissioner's decision is due to be affirmed.

### I.  PROCEDURAL HISTORY

Mr. McLain filed an application for DIB on June 3, 2012, alleging disability beginning on February 9, 2009.  (Doc. 6-3 at R.28; *see* doc. 6-4 at R.135.)[1]  His application was denied initially.  (Doc. 6-3 at R.28; doc. 6-5 at R.84.)  Thereafter, he requested a hearing before an Administrative Law Judge [ALJ], which was held on May 29, 2013, in

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.  References to page numbers in the Commissioner's record are set forth as "R.___".

Birmingham, Alabama.  (Doc. 6-3 at R.28, R.44; *see* doc. 6-5 at R.92.)  After the hearing, the ALJ found that, although Mr. McLain was unable to perform any past relevant work, he was "capable of making a successful adjustment to other work that existed in significant numbers in the national economy."  (Doc. 6-3 at R.37.)  In light of this finding, the ALJ denied Mr. McLain's request for a period of disability and DIB on August 15, 2013.  (*Id.* at R.38.)

Mr. McLain then requested review of the ALJ's Decision by the Appeals Council. (*See id.* at R.19.)  The Appeals Council "found no reason under [its] rules to review the Administrative Law Judge's decision.  Therefore, [it] denied [Mr. McLain's] request for review."  (*Id.* at R.1.)  The ALJ's decision is the final decision of the Commissioner.  (*Id.*)

Following denial of review by the Appeals Council, Mr. McLain filed an appeal in this court.  (*See generally* doc. 1.)

## II.  <u>STANDARD OF REVIEW</u>

In reviewing claims brought under the Social Security Act, this court's role is a narrow one: "Our review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner, and whether the correct legal standards were applied."  *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *see also Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).  The court gives deference to factual findings.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991).  The court "may not decide the facts anew, reweigh the evidence, or substitute [its]

judgment for that of the [Commissioner], rather [it] must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983)) (internal quotations and other citation omitted). "The Commissioner's factual findings are conclusive if supported by substantial evidence." *Wilson*, 284 F.3d at 1221 (citing *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987)). "Substantial evidence" is "more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel v. Commissioner of Social Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citations omitted).

Conclusions of law made by the Commissioner are reviewed de novo. *Cornelius*, 936 F.2d at 1145. "No . . . presumption of validity attaches to the [Commissioner's] conclusions of law." *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

### III.  DISCUSSION

### A.  THE FIVE-STEP EVALUATION

The regulations require the Commissioner to follow a five-step sequential evaluation to determine whether a claimant is eligible for a period of disability and DIB. *See* 20 C.F.R. § 404.1520(a)(1)-(2); *see also Bowen v. City of New York,* 476 U.S. 467, 470 (1986). "[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

The specific steps in the evaluation process are as follows:

### 1. Substantial Gainful Employment

First, the Commissioner must determine whether the claimant is engaged in "substantial gainful activity." *Bowen v. Yuckert*, 482 U.S. 137, 137 (1987). The regulations define "substantial gainful activity" as "work activity that is both substantial and gainful."[2] 20 C.F.R. § 404.1572. If the claimant is working and that work is substantial gainful activity,

---

[2]The regulations state:

(a) *Substantial work activity*. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) *Gainful work activity*. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

(c) *Some other activities*. Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity.

20 C.F.R. § 404.1572.

the Commissioner will find that the claimant is not disabled, regardless of the claimant's medical condition or his age, education, and work experience.  20 C.F.R. § 404.1520(b). "Under the first step, the claimant has the burden to show that [he] is not currently engaged in substantial gainful activity." *Reynolds-Buckley v. Commissioner of Social Sec.*, 457 Fed. Appx. 862, 863 (2012).[3]

The ALJ found that Mr. McLain had "not engage[d] in substantial gainful activity during the period from his alleged onset date of February 9, 2009[,] through his date last insured of December 31, 2010."  (Doc. 6-3 at R.31.)

## 2.  Severe Impairments

If the claimant is not engaged in substantial gainful activity,  the Commissioner must next determine whether the claimant suffers from a severe impairment or combination of impairments that significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii), (c).  "[A] 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  The regulations provide:  "[I]f you do not have any impairment or combination of impairments which significantly limits your physical or mental

---

[3]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it.  ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority***."  11th Cir. R. 36-2 (emphasis added).

ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.  We will not consider your age, education, and work experience." 20 C.F.R. § 404.1520(c).  "An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1521(a).  A complainant may be found disabled based on a combination of impairments even though none of the individual impairments alone are disabling. *Walker v. Brown*, 826 F.2d 996, 1001 (11th Cir. 1985); *see also* 20 C.F.R. § 404.1523.  A claimant has the burden to show that he has a severe impairment or combination of impairments. *Reynolds-Buckley*, 457 Fed. Appx. at 863.

The ALJ found that Mr. McLain had the following severe impairments: "post herpetic neuralgia and trigeminal neuralgia."  (Doc. 6-3 at R.31.)

### 3. The Listings

If the claimant has a severe impairment, the Commissioner must then determine whether the claimant's impairment meets or is equivalent to any one of the listed impairments, which are impairments that are so severe as to prevent an individual with the described impairment from performing substantial gainful activity.   20 C.F.R. § 404.1520(a)(4)(iii), (d)-(e); *see* 20 C.F.R. pt. 404, Subpart P, Appendix 1 [The Listings].  If the claimant's impairment meets or equals an impairment listed in the regulations, the

Commissioner must find the claimant disabled, regardless of the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(d). The claimant has the burden of proving that his impairment meets or equals the criteria contained in one of the Listings. *Reynolds-Buckley*, 457 Fed. Appx. at 863.

The ALJ found that, between February 9, 2009, and December 31, 2010, Mr. McLain did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. (Doc. 6-3 at R.33.)

### 4. Residual Functional Capacity and Past Relevant Work

If the impairment or combination of impairments does not meet or equal the criteria of a Listing, the claimant must prove that his impairment or combination of impairments prevents him from performing his past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f). At step four, the Commissioner "will first compare [her] assessment of [the claimant's] residual functional capacity [RFC] with the physical and mental demands of [the claimant's] past relevant work. 20 C.F.R. § 404.1560(b). "Past relevant work is work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [him] to learn to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant is capable of performing his past relevant work, the Commissioner will find he is not disabled. 20 C.F.R. § 404.1560(e). The claimant bears the burden of establishing that the impairment or combination or impairments prevents him from performing his past relevant work. *Reynolds-Buckley*, 457 Fed. Appx. at 863.

Based on his consideration of "all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence," the ALJ found, "[b]etween February 9, 2009, and December 31, 2010, [Mr. McLain] had the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) which allowed for no driving, no unprotected heights, and no operation of hazardous machinery." (Doc. 6-3 at 33.)  Based on the RFC, the ALJ found that Mr. McLain could not perform his past relevant work as a homebuilder or as a director of an educational program. (*Id*. at R.36.)

### 5. Other Work in the National Economy

If the claimant establishes that he is unable to perform his past relevant work, the Commissioner must show that the claimant – in light of his RFC, age, education, and work experience – is capable of performing other work that exists in substantial numbers in the national economy. *Reynolds-Buckley*, 457 Fed. Appx. at 863; *see also* 20 C.F.R. § 404.1520(c)(1).   The regulations provide:

> If we find that your [RFC] is not enough to enable you to do any of your past relevant work, we will use the same [RFC] assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work.  We will look at your ability to adjust to other work by considering your [RFC] and your vocational factors of age, education, and work experience.  Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

20 C.F.R. § 404.1560(c)(1).  If the claimant is not capable of performing such other work, the Commissioner must find the claimant is disabled.  20 C.F.R. § 404.1520(f).  If, however,

the Commissioner finds that the claimant can perform other work, the claimant has the burden to prove he is not capable of performing such other work.

The ALJ found that Mr. McLain, who was born in 1956, was a person of advanced age.  (Doc. 6-3 at 36.)  He found Mr. McLain had a master's degree and could communicate in English.  (*Id*.)  He also found that "[t]ransferability of job skills [was] not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills."  (*Id*.)

The ALJ consulted a vocational expert [VE]; the VE testified that an individual with Mr. McLain's RFC and vocational factors could perform jobs that exist in significant numbers in the national economy, including packager and industrial cleaner.  (*Id*. at R.37, R.74-75.)  Based on this testimony, the ALJ found Mr. McLain could make a successful adjustment to perform other work.  (*Id*. at R.37.)

Therefore, the ALJ found that Mr. McLain had not been under a disability at any time from February 9, 2009, the alleged onset date, through December 31, 2010, the date last insured.  (*Id*.)

**B.  MR. McLAIN'S ISSUES ON APPEAL**

On appeal, Mr. McLain contends:

I.  [The] ALJ . . . failed to properly evaluate Plaintiff's pain-based claim under the Eleventh Circuit Pain Standard.

II.  The ALJ erred by failing to make a properly supported credibility finding for the Plaintiff.

III.  The ALJ rejected the only opinion evidence of record and thus has improperly based his [RFC] findings on only his own lay opinion.

(Doc. 1 at 1-2.)  For the reasons set forth below, the court finds that the Commissioner's decision is due to be affirmed.

## 1.  Medical Opinion Testimony and the RFC

Mr. McLain contends that the ALJ improperly discounted the weight accorded the opinions of his treating physicians and improperly based his RFC finding on his own opinion. (Doc. 1 at 24.)

> Unfortunately, [Mr. McLain's] contention is legally unsound and factually incorrect, in part, because [Mr. McLain] overlooks that the regulations and the law of this circuit do not require the ALJ to rely on a medical source opinion when assessing RFC.  Rather, the pertinent regulation provides that opinions on issues reserved to the Commissioner are not medical opinions:

>> Opinions on some issues, such as the examples that follow, are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

> 20 C.F.R. [§] 404.1527(d) . . . .  One of the specifically reserved examples is a claimant's RFC:  "Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner."  20 C.F.R. [§] 404.1527(d)(2) . . . .  Consequently, the Eleventh Circuit has recognized that "the task of determining a claimant's residual functional capacity and ability to work is within the province of the ALJ, not of doctors." *Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010).  Moreover, an ALJ's RFC finding can be supported by substantial evidence even without a medical source statement in the record.  *See Green v. Soc. Sec. Admin.*, 223 F. App'x 915, 922–23 (11th

> Cir. 2007)(rejected the claimant's argument "that without [the physician's] opinion, there [was] nothing in the record" to support the ALJ's RFC assessment).  In other words, contrary to [Mr. McLain's] contention, the ALJ does not commit an error if the ALJ's RFC is not based on a medical source opinion.

*Scott v. Colvin*, No. 3:12-CV-3880-AKK, 2014 WL 4187444, at *3-4 (N.D. Ala. Aug. 18, 2014).

Therefore, to the extent Mr. McLain contends the decision of the Commissioner is due to be reversed merely because the RFC was not based on a medical source opinion, such contention is rejected.

As to his contention that the ALJ erred in rejecting medical source opinions, the court finds no error. "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011)(quoting 20 C.F.R. § 404.1527(a)(2)).  As to the medical opinions attached to Mr. McLain's brief and the State medical consultant, the court finds no error in the ALJ's failure to consider these opinions because they do not relate to the time before Mr. McLain's date last insured.  "[F]ederal courts are limited to reviewing 'the decision of the ALJ as to whether the claimant was entitled to benefits during a specific period of time,'" in this case, the time between the alleged onset date, February 9, 2009, and the date last insured, December 31,

2010. *Haggermaker v. Colvin*, No. 5:14-CV-1855-AKK, 2015 WL 5579557, at *4 (N.D. Ala. Sept. 23, 2015)(quoting *Wilson v. Apfel*, 179 F.3d 1276, 1279 (11th Cir. 1999)). "Evidence of deterioration of a previously-considered condition may subsequently entitle a claimant to benefit from a new application, but it is not probative of whether a person is disabled during the specific period under review." *Id.* (quoting *Enix v. Comm'r of Soc. Sec.*, 461 Fed. Appx. 861, 863 (11th Cir. 2012)(citing *Wilson*, 179 F.3d at 1279)). Therefore, such "[e]vidence is irrelevant and immaterial when it relates to a time period ***after*** the eligibility determination at issue." *Carroll v. Soc. Sec. Admin., Com'r*, 453 Fed. Appx. 889, 892 (11th Cir. 2011)(citing *Wilson*, 179 F.3d at 1278-79)(emphasis added).

As for the relevant time period, the medical records show the following:

Mr. McLain was seen at the emergency room at the University of Alabama at Birmingham [UAB] Hospital on February 6, 2009, "complaining of a severe right-sided headache that began [on February 5, 2009]." (Doc. 6-8 at R.217.) He reported his headache "originate[d] from the base of the skull, but it [was] most prominent over [his] right temporal area. Additionally, he [had] some tingling as well as some pain over his right eye superficially." (*Id.*) He was diagnosed with a migraine headache and released with a prescription for Fiorinal. (*Id.* at R.217-18.) After treatment in the emergency room and at the time he was released, Mr. McLain reported that his pain was 2/10. (*Id.* at R.218.)

Two days later, on February 8, 2009, Mr. McLain returned to the UAB emergency room complaining of "right-sided facial pain." (*Id.* at R.221.) "[U]pon presentation he . .

12

. complain[ed] of a rash over his right forehead and eye as well as induration of his right eyelid." (*Id*. at R.224.)  On examination, Mr. McLain had severe tenderness upon palpation over the right facial area and the region of V1 of the cranial nerve.  (*Id*. at R.221.)   He was diagnosed with herpes zoster, shingles, in a V1 distribution and admitted to the hospital.  (*Id*. at R.225.)  He "steadily improved over the course of his [three-day] hospital stay," and he was discharged on day four in "good" condition.  (*Id*. at R.225-26.)

On March 3, 2009, Steven Rudd, M.D., examined Mr. McLain; at that time, Dr. Rudd noted that Mr. McLain's "chief complaint" was "I just had shingles, and my face is giving me fits."  (*Id*. at R.235.)  Dr. Rudd wrote in his note, "At this point, the patient is most concerned about drawing sensation through the face and occasional sharp pain through the cheek and occasionally through the neck and down the right arm." (*Id*.)  On examination, he noted Mr. McLain had "some extreme sensitivity in the right V1 and V2 trigeminal distributions."  (*Id*. at R.236.)  Dr. Rudd advised Mr. McLain "to be aggressive with treatment at this point to prevent[ ] a full blown neuralgia syndrome from evolving." (*Id*.) Dr. Rudd ordered additional diagnostic testing to rule out the possibility of postherpetic aneurysm or structural trigeminal lesion.  (*Id*.)

An enhanced magnetic resonance imaging [MRI] of Mr. McLain's brain revealed "a few small, rounded, discrete regions of increased T2 signal intensity appear subcortically and are not associated with restricted diffusion;" otherwise, the remainder of this MRI and the other imagining tests were normal.  (*Id*. at R. 238-45.)

13

Mr. McLain returned to Dr. Rudd on March 10, 2009.  (Doc. 6-12 at R.389.)  He told Dr. Rudd that he had "gained a fair amount of relief in the facial pain, while the numbness linger[ed].  (*Id*.)  Dr. Rudd reported his clinical impression as "[s]ome post shingles neuralgia, improving, with no evidence on MR imaging . . . of serious complications such as intracranial aneurysm or the like."  (*Id*. at 390.)

Mr. McLain had an electromyogram [EMG] study, which was normal.  (Doc. 6-8 at R.243.)  Dr. Rudd noted that the EMG did not show "denervation or other significant abnormalities," and his impression was the EMG was a "[n]ormal study, with good prognostic signs as far as possible involvement of branches of the facial nerve or peripheral nerves in the right or left arm are concerned."  (*Id*.)

On April 6, 2009, Mr. McLain returned to Dr. Rudd.  (Doc. 8-12 at R.392.)  He reported that he had "definitely noticed a shrinking of the painful spot on [his] brow," and that he had "conscientiously [taken] himself off the stronger nonspecific analgesics."  (*Id*.)  As his "clinical impression," Dr. Rudd noted that Mr. McLain's postherpetic neuralgia was "resolving."  (*Id*. at R.393.)

Mr. McLain returned to Dr. Rudd on May 5, 2009, at which time Mr. McLain reported that "[t]he pain is fairly dramatically better, but he [was] still plagued by a pain localizing to the right eye brow."  (*Id*. at R.395.)  As his "clinical impression," Dr. Rudd noted that Mr. McLain's postherpetic neuralgia was "slowly resolving."  (*Id*. at R.396.)

14

Mr. McLain had a follow-up visit at the Sleep Disorder Center of Alabama and William Adams, M.D., on May 26, 2009.  (Doc. 6-13 at R.509-10.)  Dr. Adams diagnosed Mr. McLain with "[s]leep onset difficulty, currently related to pain."  (*Id*. at R.510.)  He noted, "The pain of shingles including involvement of the right eye and the post-herpetic neuralgia pain is still present and still interferes with sleep.  Sleep pattern is being greatly disrupted by this illness."  (*Id*. at R.509.)

On May 28, 2009, Mr. McLain returned to Dr. Rudd ahead of schedule "because, after some slow improvement in the postherpetic facial pain, he developed some more severe pain around the eye."  (*Id*. at R.398.)  Dr. Rudd noted that he was concerned about a vascular component because it was not unheard of for "a neuralgia involving the face [to] take on the characteristics of a vascular headache."  (*Id*. at R.399.)

On July 14, 2009, Mr. McLain reported to Dr. Rudd that "he has had no dramatic improvement in some persistent neuralgia over the eye on his current regimen."  (Doc. 6-12 at R.401.)  At this time, Dr. Rudd noted, "We have discussed options, in between this I am going to give this four more weeks and then go ahead and make [a] referral for an anaesthesia pain management approach, possibly using acupuncture or some proximal nerve blocks."  (*Id*. at R.402.)

Mr. McLain received additional medical treatment from Thomas Kraus, D.O., for his conditions beginning on July 29, 2009.  (*Id*. at R.313.)  Mr. McLain complained of aching, burning, swelling, and tingling in his right eyebrow and on the right side of his skull; he

described the pain as a 7/10. (*Id*.)  Dr. Kraus recommended Mr. McLain receive a supra-orbital nerve block, which he received the following day, July 30, 2009. (*Id*. at R.311, R.315.)

On August 3, 2009, Mr. McLain saw Dr. Rudd and told him that "a branch nerve block with injection over the right eyebrow [took] away the unrelenting postherpetic neuralgia for the space of an hour or so." (Doc. 6-12 at R.404.)  Dr. Rudd noted, "I am going to keep up the Keppra . . . and  make . . . Lortab available while the patient continues to get some nerve blocks in the short term, and I am going to see if I can expedite a referral to Dr. Winfield Fisher in the near term to see what is available for surgical approaches to facial neuralgia." (*Id*. at R.405.)

Mr. McLain returned to Dr. Kraus on August 5, 2009, and reported that he had gotten only 24 hours of relief from the nerve block.[4] (*Id*. at R.309.)  Dr. Kraus administered a "neurolytic peripheral nerve block, supraorbital" with botox on August 10, 2009. (*Id*. at R.306, R.308.)   At this time, Mr. McLain described his pain as 8/10. (*Id*. at R.306.)

On September 1, 2009, Mr. McLain was seen by Winfield S. Fisher, III, M.D., a neurosurgeon at UAB. (Doc. 6-8 at R.247.)  Dr. Fisher noted that Mr. McLain reported pain between 3/10 to 8/10 and he also found that Mr. McLain had loss of pinprick sensation in his

---

[4]A month earlier he had told Dr. Rudd that he received only one hour of relief from the nerve block. (*See* doc. 6-12 at R.404.)

right V1 dermatome.  (*Id*. at R.247-48.)  On that same day, Mr. McLain had an MRI, which showed "no significant abnormality to account for [his] facial pain."  (*Id.* at R.252.)

Mr. McLain returned to Dr. Fisher on October 13, 2009.  (*Id*. at R.251.)  Following this appointment, Dr. Fisher noted that Mr. McLain was "quite reluctant to undergo gamma knife therapy . . . because of the risk of numbness."  (*Id*.)

Mr. McLain saw Dr. Rudd on November 18, 2009.  (*Id*. at R.407.)  At this time, Dr. Rudd decided to maintain Mr. McLain on his current regimen and schedule a return visit for three months.  (*Id*. at R.408.)

On February 8, 2010, Mr. McLain told Dr. Rudd that he was "30% better."  (*Id*. at R.409.)  Dr. Rudd noted that Mr. McLain had "settled into a pattern of gradual recovery," and, "[g]iven the course, as well as the EMG survey today . . . , which confirms the isolation of the lesion to the trigeminal, with no motor involvement, I think this is an optimistic course at this point of what was a chronic but self-limited post-herpetic neuralgia syndrome involving the right trigeminal branches."  (*Id*. at R.409-10.)

On May 10, 2010, Mr. McLain told Dr. Rudd that he had some improvements in his pain following botox injections, but he had some "sharp plunges around the eye and toward the vertex."  (Doc. 6-12 at R.411.)  Dr. Rudd noted his clinical impression was "slowly resolving herpetic neuralgia with no indication of complication from botox or altment of the facial nerves on the EMG . . . ."  (*Id*.)

Mr. McLain had a follow-up visit with Dr. Adams at the Sleep Disorders Center on May 25, 2010. (Doc. 6-13 at R.507-08.) Dr. Adams noted that Mr. McLain had a "flare-up" of difficulty falling asleep; he stated that "[p]ost[-]herpetic neuralgia and its sequelae have interfered significantly with sleep as have some other stressful events in his life." (*Id*. at R.508.) The "other stressful events" are not identified in Dr. Adams's notes. (*See id*. at R.507-08.) However, he did note that McLain was "still experiencing a great deal of discomfort from the neuralgia." (*Id*. at R.507.)

Mr. McLain returned to Dr. Rudd on August 6, 2010; no changes in his condition were noted. (*See* doc. 6-12 at R. 413-14.)

On November 12, 2010, Mr. McLain returned to Dr. Rudd, who noted that Mr. McLain had "a syndrome of anesthesia dolorosa," which he explained as "a first trigeminal division sensory loss," but with "pain [experienced] through the area extending through the scalp." (Doc. 6-12 at R.415.) As testing did not show denervation, Dr. Rudd noted that he would not push for further testing but work with "adjusting the present symptomatic regimen." (*Id*. at R.416.)

On or about November 16, 2010, Rebecca B. Kissel, M.D., examined Mr. McLain. (*See* doc. 6-8 at R.265-66.) He told Dr. Kissel that nothing but nerve blocks have provided relief. (*Id*. at R.265.) Dr. Kissel's treatment recommendations included bacterial and fungal

18

cultures, a punch biopsy, and Vaseline in lieu of the topical ointments Mr. McLain was currently using.[5]  (*Id.*)

Mr. McLain has not pointed to any specific material medical records or treating physician's opinion that they ALJ failed to consider and/or improperly weighed.[6]  (*See* doc. 8 at 24-29.)  In his Statement of Facts, he quotes extensively from medical opinions rendered after the date last insured.  (*See* doc. 8 at 10-17.)  However, he makes no effort to establish that these opinions relate to a time before the date last insured or to direct the court to a medical source opinion from within the relevant time period.

With regard to medical opinions, the ALJ found:

_____

[5]During this time, Mr. McLain also received treatment for sunspots.  The ALJ found:

The claimant initiated dermatological treatment at Inverness Dermatology on November 19, 2009.  The claimant reported having spots on his scalp and neck.  He complained that the spots caused him to experience pain and a burning sensation.  The claimant was prescribed Pramasome, which he indicated was helpful.  In March 2010, the claimant elected to have specimens from his scalp extracted for further diagnostic testing.  Laboratory findings revealed that the claimant had hypertrophie actinic keratosis.  When the claimant returned for a follow up consultation, his actinic keratosis had resolved.  The claimant continued to report ongoing pain with periods of improvement.  It was noted in the treatment record that the claimant reported symptoms that were disproportionate to the lesions and pathology which he described.

(Doc. 6-3 at R.32-33 [discussing doc. 6-10 at R.279-870].)

[6]Mr. McLain sets forth a number of medical records and opinions in the fact section of his brief, including records and opinions outside the relevant time period.  (*See* doc. 8 at 7-17.)  However, in the argument section, he does not address any particular medical records or opinions that he contends the ALJ failed to properly consider.  (*See* doc. 8 at 24-29.)

> As far a medical opinions are concerned, minimal weight is accorded to the opinions of Samuel D. Williams, M.D., a non-examining state agency consultant. It appears that the consultant did not address the pertinent times at issue. Furthermore, no treating or examining physician opined that the claimant had limitations greater than established by the determined residual functional capacity assessment.

(Doc. 6-3 at R.37.) The court has considered the entire record, as well as the medical opinions attached to Mr. McLain's brief. Based on its review, the court finds that the ALJ's decision regarding the medical opinions is supported by substantial evidence in light of the relevant time period at issue: the alleged onset date, February 9, 2009, to the date last insured, December 31, 2010.

The court finds that Mr. McLain has not demonstrated that the ALJ erred in weighing the medical source opinions of record from the relevant time period. Therefore, the Commissioner's decision on this issue will be affirmed.

## 2. The Pain Standard and Credibility Determination

Mr. McLain argues that the ALJ failed to properly evaluate his claim under the Eleventh Circuit pain standard. (*Id.* at 17.) Review of an ALJ's application of legal principles is plenary, and failure to apply the proper legal standard dictates reversal. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995)(per curiam).

In this Circuit –

> A claimant may establish [his] disability through [his] own testimony of pain or other subjective symptoms. *See Dyer* [*v. Barnhart*], 395 F.3d [1206,] 1210 [(11th Cir.2005)]; *Foote v. Chater*, 67 F.3d 1553, 1560-61 (11th Cir. 1995). The ALJ must consider a claimant's testimony of pain and other subjective symptoms where the claimant meets our three-part "pain standard."

*See Foote*, 67 F.3d at 1560.  Under that test, evidence of an underlying medical condition must exist.  *Id*.  If that threshold is met, then there must be either objective medical evidence that confirms the severity of the alleged pain or symptoms arising from the underlying medical condition, or evidence that the objectively-determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain or symptoms.  *Id*.  A claimant's subjective testimony supported by medical evidence that satisfies our pain standard is sufficient to support a finding of disability.  *Id.* at 1561.

If the record shows that the claimant has a medically-determinable impairment that could reasonably be expected to produce [his] symptoms, the ALJ must evaluate the intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work.  20 C.F.R. §404.1529(c)(1).  In doing so, the ALJ considers all of the record, including the objective medical evidence, the claimant's history, and statements of the claimant and [his] doctors.  *Id.* § 404.1529(c)(1)-(2).  The ALJ may consider other factors,  such as: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of the claimant's medication; (5) any treatment other than medication; (6) any measures the claimant used to relieve [his] pain or symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to [his] pain or symptoms.  *Id.* §404.1529(c)(3).  The ALJ then will examine the claimant's statements regarding [his] symptoms in relation to all other evidence, and consider whether there are any inconsistencies or conflicts between those statements and the record.  *Id.* § 404.1529(c)(4).

If the ALJ decides not to credit the claimant's testimony as to [his] subjective symptoms, the ALJ must articulate explicit and adequate reasons for doing so or the record must be obvious as to the credibility finding.  *See Foote*, 67 F.3d at 1561-62.  While the ALJ does not have to cite particular phrases or formulations, broad findings that a claimant was incredible and could work are, alone, insufficient for [the court] to conclude that the ALJ considered the claimant's medical condition as a whole.  *Id.* at 1562.  The ALJ's articulated reasons must also be supported by substantial evidence.  *Jones v. Dep't of Health & Human Servs.,* 941 F.2d 1529, 1532 (11th Cir. 1991).  [The court] will not disturb a properly articulated credibility finding that is supported by substantial evidence.  *Foote*, 67 F.3d at 1562.  The failure to articulate reasons for discrediting a claimant's subjective testimony, however, requires that the

testimony be accepted as true and becomes grounds for remand where credibility is critical to the outcome of the case.  *Id.*

*Strickland v. Comm'r of Soc. Sec.*, 516 Fed. Appx. 829, 831-32 (11th Cir. 2013).  The court

finds that the ALJ clearly articulated and applied the correct legal standard for evaluating Mr.

McLain's pain-based claim.  (*See* doc. 6-3 at R.34-35.)

The ALJ found that Mr. McLain's testimony was not fully credible; specifically, he

found:

> The claimant's description of his pain and limitations arising from his condition are not fully credible to the extent a conclusion of disability was warranted between February 9, 2009, and December 31, 2010, the date he last met the special earnings requirements of the Act.  The claimant has been treated for occasional right sided facial and head pain caused by his impairment.  Yet, the pertinent documentary record does not establish the extent or degree of severity alleged.  Instead, it shows only intermittent episodes of pain exacerbations which were addressed.  For instance, when seen in the emergency room on February 2, 2009, for a headache, the claimant was treated and later reported that his pain was 2 out of 10.  When he returned to the emergency room 6 days later for a rash with facial and head pain, pain control was achieved.  The rash also steadily improved, and the claimant was discharged in stable condition.  One month later, the claimant reported to Dr. Rudd, that he gained a fair amount of relief in his facial pain.  He informed Dr. Krauss that he only obtained 24 hours of relief from a pain block in July 2009, and in September told Dr. Fisher that his pain level fluctuated between 3 to 8 out of 10.  Over one year later, in November 2010, the claimant reported that only nerve blocks gave him relief.  Earlier laboratory studies, including a CT scan and electromyogram were negative for any acute intracranial abnormality.  No ocular pathologies have been identified.

(*Id*. at R.35.)

Mr. McLain contends that "[t]he ALJ in this case failed to offer any justification as

to why he found Mr. McLain's pain testimony not fully credible." (Doc. 8 at 24.)  He

contends that the ALJ "cherry-picked" from his medical records to find that he had only occasional right-side facial pain.  (*Id.* at 23.)  The court disagrees.

Focusing on the medical records from the relevant time period, the court finds the evidence supports the ALJ's findings that McLain was "treated for occasional right sided facial and head pain caused by his impairment," and he suffered "only intermittent episodes of pain exacerbations."  (Doc. 6-3 at R.35.)  Mr. McLain has submitted evidence from after his date last insured with his brief; however, the court does not find that this evidence relates to a period before his date last insured.  As to this relevant time period, the court finds the ALJ's articulated specific reasons for finding Mr. McLain's alleged pain and other subjective symptoms were not fully credible and the record contains substantial evidence to support these reasons.

Therefore, the court finds the Commissioner's decision is due to be affirmed.

## CONCLUSION

For the reasons set forth above, the decision of the Commissioner is due to be reversed.  An Order affirming the decision of the Commissioner will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 29th day of March, 2016.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
SENIOR UNITED STATES DISTRICT JUDGE